UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VINCENT CALABRO,

         Plaintiff,    **MEMORANDUM & ORDER**
                04 Civ. 0094 (DRH) (WDW)
   - against -

NASSAU UNIVERSITY MEDICAL CENTER,

         Defendant.
------------------------------------------------------------X
**APPEARANCES :**

**LAW OFFICES OF JASON ABELOVE**
666 Old country Road
Suite 304
Garden City, NY 11530
By: Jason Abelove, Esq.

**CLIFTON, BUDD & DeMARIA LLP**
Attorneys for Defendant
420 Lexington Avenue
Suite 420
New York, NY 10170
By: George Felix Brenlla, Esq., & Shaffin Abdul Datoo, Esq.


**HURLEY, District Judge:**

## INTRODUCTION

    Plaintiff Vincent Calabro ("Plaintiff") filed the present action, pursuant to 42 U.S.C. § 1983 ("§ 1983") and New York Labor Law § 740 ("Whistleblower Law"), claiming that Defendant Nassau University Medical Center ("Medical Center") terminated his employment for, *inter alia*, comments he made to a local news channel regarding the conditions at the Medical Center loading dock, through which various items, including foodstuffs, are received at the

hospital. Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons herein, Defendant's motion is DENIED.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted.

Plaintiff is a former employee of the Medical Center. Though his working title was "Food Inspector," he performed a number of tasks for the Medical Center during his tenure. The Medical Center is a hospital and a public employer.

Plaintiff was employed and terminated by the Medical Center on a number of occasions since 1989. He was originally hired in 1989 as a Food Inspector I and eventually promoted to Food Inspector II. His responsibilities included inspecting and reporting on all food shipments coming into the Medical Center. Plaintiff apparently complained on a number of occasions that vendors were billing the Medical Center for more food than was being delivered or for delivering unusable food. These complaints were typically disregarded.

In 1991, the Medical Center eliminated the "Food Inspector" position and Plaintiff was fired in 1992. After his 1992 firing, Plaintiff filed a grievance pursuant to the collective bargaining agreement then in effect, and won back his job through the grievance process in 1994. He was reassigned to a position with Nassau County in its purchasing department. Plaintiff worked in purchasing department from his re-hiring until 1997 when he was transferred back to the Medical Center, where he worked in a number of different departments. In 2000, Plaintiff was promoted to supervisor of the mailroom. Though he did not inspect any food during this period, he continuously maintained the title of Food Inspector II.

In early March 2000, Plaintiff complained to his supervisor in administration, Steve Suspenski ("Suspenski"), that an NCAA basketball pool was being conducted by the Medical Center administration. Plaintiff feared that the public may interpret such a pool run by the administration as administrative support of gambling on County time. Suspenski advised Plaintiff to allow the pool, but Plaintiff asked for confirmation in writing, apparently infuriating Suspenski. Several weeks later, on March 23, 2000, Plaintiff was terminated.

Once again, Platiniff filed a grievance. After a hearing, the Administrative Law Judge ordered the Medical Center to re-hire Plaintiff in the dietary department. On February 13, 2001, Plaintiff returned to the Medical Center personnel office, but was assigned to a variety of tasks, including assignments to the telephone room, grants management, and the loading dock. Again, he maintained the title of Food Inspector, but never inspected any food.

While working on the loading dock Plaintiff made a number of complaints regarding "feces and human waste, soiled clothing, bed sheets, biohazards, dead animals from the laboratory, vermin, insects, mosquitos gnats and the associated stench." (Pl.'s Mem in Opp'n at 7 (citing Dep. of Vincent Calabro, dated August 23, 2004 ("Calabro Dep.") at 37-38).) Nothing ever came of his complaints.

Meanwhile, in May 2003, Richard Turan, the Medical Center's CEO sent out an e-mail, asking supervisors to eliminate positions that were "unnecessary/inappropriate." (Morris Affirmation, Ex. B.) Suspenski identified the Food Inspector position as being both unnecessary and inappropriate because there was no one actually inspecting the food. In a memo dated June 12, 2003, Karl Kampe, the Medical Center's head of Human Resources wrote, "We have

identified the position of Food Inspector II and are prepared to abolish this position under Section 80 of Civil Service law." (*Id.* at Ex. F.)

As Defendant's put it, Plaintiff's "appearance on a WNBC channel 4 news broadcast interrupted the process of terminating Calabro's employment." (Defs.' Summ. J. Mem. at 8.) Tim Minton, a news reporter, contacted Plaintiff concerning an "investigative report surrounding the delivery area at the hospital." (Pl.'s Opp'n Mem. at 8.) "Mr. Minton advised [Plaintiff] that [he] was the only employee who had the title of Food Inspector and [Mr. Minton] wanted to know how [Plaintiff] was permitting food to pass through such an unsanitary loading dock." (Calabro Aff. ¶ 32.) Plaintiff told Mr. Minton that he had not been permitted to inspect food for years. Plaintiff's comments were part of Mr. Minton's report, which was broadcast on June 18. The next day, the Civil Service Commission issued a memo stating, "The position is held by Mr. Vincent Calabro . . . . Should the position be abolished Mr. Calabro would be laid off as he has no bump or retreat rights." (*Id.* at Ex. G.)

Immediately after his comments aired on the news, the Medical Center commenced an investigation of Plaintiff's comments. On July 3, 2005, approximately two weeks after the broadcast, Plaintiff was called into a meeting with various high-ranking hospital employees and questioned with regard to his complaints. At the close of that meeting, Mr. Kampe stated, "[T]he corporation has uhm, made a determination that uh, we no longer need a food inspector in this hospital. So we're going to uh, abolish your position as of closing today." (Pl.'s Rule 56.1 Statement, Ex. J at 6.) After exhausting his administrative remedies, Plaintiff filed the present complaint on January 12, 2004. Defendant filed its answer on February 4, 2004.

# DISCUSSION

I.  *Summary Judgment Standard*

Summary judgment pursuant to Rule 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Rule 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the

motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant will be unable to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

**II.** *First Amendment Retaliation*

Defendant contends that Plaintiff cannot establish a *prima facie* case for his § 1983 claim. Although a public employee "does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment," these rights are not absolute, because the public employers has a legitimate interest in regulating the speech of its employees to promote the efficiency of its public services. *See Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003) (citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The extent of permissible regulation of speech under these circumstances is determined by balancing the interest of the employee in commenting on matters

of public concern against the interest of the public employer in promoting the efficiency of the services it performs through its employees. *See Morris v. Lindau*, 196 F.3d 102, 109-10 (2d Cir. 1999).

Before reaching this balancing test, a public employee making a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence: (1) that his speech addressed a matter of public concern; (2) that he suffered an adverse employment action; and (3) that a causal connection existed between the speech and the adverse employment action, "so that it can be said that his speech was a motivating factor in the determination." *Id.* at 110; *see also Mandell*, 316 F.3d at 382; *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001) (describing elements of First Amendment retaliation claim).

If the plaintiff produces evidence of these three elements, the public employer may nevertheless escape liability on one of two separate rationales. One way the public employer may prevail is by demonstrating by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech. *See Morris*, 196 F.3d at 110. Alternatively, the public employer may show that the plaintiff's speech was likely to disrupt the government's activities, and the likely disruption was "sufficient to outweigh the First Amendment value of plaintiff's speech." *Locurto*, 264 F.3d at 166; *see also Mandell*, 316 F.3d at 383. The Medical Center does not argue the latter rationale, focusing instead on the fact that it would have taken the adverse employment action in the absence of Plaintiff's speech.

There is no dispute that Plaintiff suffered an adverse employment action. Therefore, the Court only discusses the "public concern" and "causal connection" elements regarding Plaintiff's

*prima facie* case, and then Defendant's attempt to avoid liability upon the rationale that it would have taken the same adverse employment action in the absence of the protected speech.

### A. *A Matter of Public Concern*

The question of whether an employee's speech addresses a matter of public concern is one of law, not fact. *See Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983); *see also Morris*, 196 F.3d at 110. "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (quoting *Connick*, 461 U.S. at 146). "If the speech, however, is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern and the government, acting as an employer, 'has greater latitude to discipline' the employee." *Id.* (quoting *Connick*, 461 U.S. at 146). As explained by the Supreme Court:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official- would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick*, 461 U.S. at 149.

Defendant essentially acknowledges that a story concerning the conditions on the loading docks is a matter of public concern, but insists that Plaintiff's comments were purely personal. (Def.'s Summ. J. Mem. at 18 ("While reporter Minton's segment dealt with the condition on the loading docks in general and alleged violation of the New York Health Code, Calabro only complained about his inability to perform food inspection at the Medical Center.").) Defendant

contends that Plaintiff had a personal stake in his statements, arguing that "[t]he fact that Vincent Calabro was not able to perform food inspection at the Medical Center is a matter of purely personal concern." (Def.'s Summ. J. Mem. at 18.)  Plaintiff counters that his statements were not personal, but rather on a matter of public concern. (*See* Pl.'s Opp'n Mem. at 18.)

The fact that an employee has a personal stake in the statement does not necessarily disqualify that speech from First Amendment protection.  *See Johnson* 342 F.3d at 114; *see also Scheiner v. NYC Health & Hosps.*, 152 F. Supp. 2d 487, 495 (S.D.N.Y. 2001).  "Mixed motivations are involved in most actions we perform every day; we will not hold plaintiffs to herculean standards of purity of thought and speech." *Johnson*, 342 F.3d at 114 (citations and quotations marks omitted).  "'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.'"  *Johnson*, 342 F.3d at 112 (quoting *Connick*, 461 U.S. at 147-48).

Plaintiff's comments to Mr. Minton were within the context of a matter of general public concern: the health conditions of at a county-run hospital are matters of concern for every member of the public who may be a patient there.  Though Plaintiff may have been lamenting his personal situation–the Medical Center's refusal to allow him to inspect food–the facts that he was the only food inspector on staff and that he was not inspecting food were, based upon the information furnished,[1] apparently significant to the newcast's central purpose of exposing the allegedly unsanitary conditions at the hospital loading dock.  Consequently, even if Plaintiff had a personal stake in his statements, his personal stake was co-extensive with the public's interest.

---

[1] Neither party submitted a transcript of the subject newscast.

As a result, Plaintiff's speech was on a matter of public concern, thereby satisfying the first prong.

### B. *Causal Connection*

Second, Plaintiff must establish a causal connection between his comments to the local news channel and the adverse employment action. As explained by the Second Circuit:

> The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech. Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus. Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision.

*Morris*, 196 F.3d at 110 (citations omitted). As for providing evidence of retaliatory motive, the newscast was critical of the Medical Center, and likely very embarrassing to its administration. It certainly could have provided Defendant with a retaliatory motive to terminate Plaintiff's employment. Defendant argues, however, that the decision to terminate Plaintiff predated the newscast and, accordingly, no causal connection may be legitimately inferred. (*See* Def.'s Summ. J. Mem. at 18-19.)

In the Second Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by "showing that the protected activity was closely followed in time by the adverse [employment] action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (citation and quotation marks omitted) (stating that twelve days between alleged

sexual harassment and discharge could suggest a causal relationship). Though there is no bright-line rule, an adverse employment action following within a couple months of the protected activity typically, indirectly establishes the causal connection. *See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446-47 (2d Cir. 1999) (holding that abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (holding that a discharge less than two months after plaintiff filed a sexual harassment complaint with management and ten days after filing complaint with state human rights office provided prima facie evidence of a causal connection between protected activity and retaliation); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (finding that an eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship). In the present case, Plaintiff was fired two weeks after he made the comments to the news channel. Thus, there is no worthy dispute that the adverse employment action "followed closely" on plaintiff's protected conduct. As a result, Plaintiff has satisfied each of the three elements of his *prima facie* case, and the Court turns to Defendant's explanation for the adverse employment action.

### C. *Defendant's Explanation*

As noted, Defendant contends that its decision to eliminate the Food Inspector position on June 12, 2003, six days before Plaintiff's interview with the local news channel, necessarily eradicates any connection between the protected activity and the adverse employment action. (*See* Def.'s Summ. J. Mem. at 19.) That is not entirely true. The June 12, 2003 letter suggested the elimination of the Food Inspector position, but it did not make a final determination. On June 19, 2003, the day after the news report, the Civil Service Commission responded, but even the

June 19 memo was not definitive. It read, "Should the position be abolished Mr. Calabro would be laid off as he has no bump or retreat rights." (*Id.* at Ex. G.) The word "should" indicates that the decision to abolish Plaintiff's position was not yet finalized.

Additionally, it is difficult to imagine why a budgetary lay-off would be coupled with the laid-off employee being told, "And uh, if you wanna come back to uh, you know, make an appointment through either Jay or Lee Shanley to come back on the property. Because, if you don't, you'll be escorted off and arrested." (Def.'s 56.1 Statement, Ex. J. at 8.) Plaintiff was thoroughly questioned before his termination, though the questions did not make any reference to his job performance. Rather, the questions focused entirely upon Plaintiff's statements to the reporter and Plaintiff's reasons for making those statements. (*See id.*) Consequently, the submitted evidence regarding the circumstances of Plaintiff's termination suggests that animus toward Plaintiff because of his protected conduct was a motivating factor in his termination.

Ultimately, the outcome of this case depends upon the proper characterization of Defendant's motives, which a factfinder is in the best position to evaluate. It would be improper at this stage for the Court to resolve whether animus toward Plaintiff because of his protected conduct was a motivating factor behind his termination. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 558 (2d Cir. 2001). Because an issue of material fact remains regarding Defendant's explanation for Plaintiff's termination, Defendant's motion for summary judgment is denied.

### III.   *Whistleblower Law*

Defendant moves for summary judgment as to Plaintiff's Whistleblower claim because Plaintiff "has not established that [the Medical Center] violated a law, rule or regulation; his

complaints to News Channel 4 were not to a public agency; and, because there is no causal connection between his complaints and his termination." (Def.'s Summ. J. Mem. at 12.) Plaintiff opposes the motion on the grounds that each of Defendant's reasons is not in accord with the relevant caselaw. (*See* Pl.'s Opp'n Mem. at 11-16.)[2]

According to New York's Whistleblower law, an employer cannot take retaliatory personnel action against an employee because the employee does any of the following: (1) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; (2) provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation of a law, rule or regulation by such employer; or (3) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation. *See* § 740(2). Neither party contends that the third type of prohibited retaliation applies to the present case.

Going in reverse order, the Court addresses the second type of prohibited retaliation first. Under the second prong, Defendant is prohibited from retaliating against Plaintiff for providing information to, or testifying before, any public body conducting an investigation, hearing or inquiry into any such violation of a law, rule or regulation by such employer. According to §

---

[2]In his opposition memorandum, Plaintiff argues that the Medical Center is liable under two whistleblower statutes: New York Civil Service Law § 75-b(2)(a) ("§ 75-b(2)(a)") and New York Labor Law § 740 ("§ 740"). (*See* Pl.'s Opp'n Mem. at 1.) Though the Complaint alleges a violation of § 740, the opposition memorandum is the first mention of § 75-b(2)(a). Because Plaintiff did not raise § 75-b(2)(a) at any time before his opposition memorandum, the Court does not address it here.

740, a "public body" includes the following: (i) the United States Congress, any state legislature, or any popularly-elected local governmental body, or any member or employee thereof; (ii) any federal, state, or local judiciary, or any member or employee thereof, or any grand or petit jury; (iii) any federal, state, or local regulatory, administrative, or public agency or authority, or instrumentality thereof; or (iv) any federal, state, or local law enforcement agency, prosecutorial office, or police or peace officer. § 740(d). A news channel is not a "public body" within the meaning of the statute. Therefore, the second prong provides no basis for Plaintiff's claim.

Thus, the first prong is the only harbor available to Plaintiff. To prove his claim under the first prong, Plaintiff must establish that the retaliatory action was because he (a) disclosed to a supervisor or to a public body (b) an activity, policy or practice of the employer that is in violation of law, rule or regulation (c) which violation creates and presents a substantial and specific danger to the public health or safety.

### A. *Disclosure to a Supervisor or Public Body*

Though Plaintiff did not disclose any information to a "public body" within the meaning of § 740, Plaintiff did make a number of complaints to his supervisors. Plaintiff stated in his sworn affidavit that he made "dozens of complaints to the Safety Service Response Department and [his] supervisor regarding the deplorable conditions at the loading dock." (Calabro Aff. ¶ 31.) Defendant does not deny that these complaints were made. Instead, Defendant hopes to defuse Plaintiff's claim with the assertion that "Plaintiff was a serial complainer. . . . If the Medical Center was going to terminate him for his complaints, it would have done so long before it did eventually terminate him." (Def.'s Summ. J. Mem. at 15.)

Defendant suggests that if it were going to retaliate against Plaintiff for his complaints to his supervisor, it would have done so long ago. Defendant submits this argument to dispel the notion of retaliatory animus. Defendant's argument is unavailing, however, because the question under this element is simply whether Defendant complained to a supervisor. He asserts that he did and Defendant does not deny that assertion. Accordingly, Plaintiff has satisfied the first element.

### B.   *Violation of Law, Rule or Regulation*

Defendant argues that Plaintiff has failed to establish an actual violation of a law, rule or regulation, thereby defeating his claim under the first type of prohibited retaliation. Section 740 "is triggered only by a violation of a law, rule or regulation that creates and presents a substantial and specific danger to the public health and safety." *Remba v. Fed'n Empl. & Guidance Service*, 76 N.Y.2d 801 (1990); *see also Rohlehr v. Brookdale Univ. Hosp. & Med. Ctr.*, 390 F. Supp. 2d 207, 210 (E.D.N.Y. 2005). The violation must be an actual violation, and an employee's good faith, reasonable belief that a violation occurred is insufficient. *See Nadkarni v. North Shore-Long Island Jewish Health Sys.*, 799 N.Y.S.2d 574, 575 (2d Dep't 2005).

Plaintiff alleges that Defendant maintained the loading dock in violation of numerous state and county statutes, including NYCRR 14-1.1 *et seq.*, which requires "owners and operators of food service establishments . . . to operate their premises in such a way as to avoid 'imminent health hazards.'" According to Plaintiff, "[t]he loading dock was set up that all incoming and outgoing materials entered and exited through the same loading dock, which was never cleaned. Accordingly, food such as loose and open produce intermingled with human waste, rotting food, and vermin." (Calabro Aff. ¶ 30.) Defendant never denies these allegations. If it is true that the

loading dock was maintained in such a manner, it is clear that the conditions of the loading dock violated NYCRR 14-1.1.

Thus, this case is analogous to *Rodgers v. Lenox Hill Hosp.*, 626 N.Y.S.2d 137 (1st Dep't 1995). The Court wrote:

> Plaintiff alleged uncontested facts supporting numerous actual violations, in that the paramedics pronounced a live woman dead without examining her or attempting resuscitation, that they attempted to cover up a second call to the same location, that they did not transport the critically ill patient to the closest hospital, and that they engaged in improper resuscitation. All of this was to show that numerous laws, operating procedures, and protocols had actually been violated. He cited with particularity the relevant sections of the Administrative Code, the Public Health Law, the EMS Operating Guide, and the Department of Health Treatment Protocols which were violated by the specific conduct described.

*Id.* Plaintiff has made a similar showing in the present case. He has alleged uncontested facts that support at least one actual violation and he has cited with particularity the relevant sections of the New York Health Code that were violated. Consequently, Plaintiff has satisfied the second element.

### C. *A Substantial and Specific Danger to the Public Health or Safety*

Hospital food passing through a loading dock allegedly covered with rodents, toxins, and human waste raises and substantial and specific danger to public health and safety. Defendant does not dispute this fact. Thus, Plaintiff has satisfied the third element.

In sum, Defendant has failed to show that there are no genuine issues of material fact regarding Plaintiff's § 740 claim that support Defendant's motion. A reasonable trier of fact could conclude that Plaintiff has established each of the three elements with regard to a Whistleblower claim. Consequently, Defendant's motion for summary judgment is denied.

## CONCLUSION

In sum, there remain issues of material fact regarding both Plaintiff's § 1983 claim and his Whistleblower claim. Accordingly, Defendant's motion for summary judgment is DENIED.

**SO ORDERED.**

Dated: March 27, 2006
      Central Islip, New York

/s/
Denis R. Hurley,
United States District Judge